

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

**ENTERED
06/08/2012**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 09-70605** |
| JESUS PENA, *et al* | § | **CHAPTER  7** |
| | § | |
| Debtor(s). | § | **JUDGE ISGUR** |
| | § | |
| | § | |
| LISA NICHOLS | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 11-7003** |
| | § | |
| JESUS PENA, *et al* | § | |
| | § | |
| Defendant(s). | § | |

## <u>MEMORANDUM OPINION</u>

The Trustee's § 727(a)(4) and § 727(a)(5) objections to discharge are granted.  The Court refers the Peñas for criminal prosecution for bankruptcy fraud.

The Peñas have repeatedly failed to provide information reasonably requested by the Trustee that would enable her to perform her duties.  Moreover, the Peñas are unable to satisfactorily explain the disposition of over $39,500.00 in missing funds.

### <u>Factual Background</u>

Jesus and Maria Refugio Peña filed chapter 7 bankruptcy on August 22, 2009.  (Case No. 09-70605, ECF No. 1).  Lisa Nichols was assigned as the Chapter 7 trustee.

The Peñas did not provide Nichols with their last two tax returns or three prior months' bank statements in advance of the first § 341 meeting of creditors, which was held on October 20, 2009.  (ECF No. 27 at 8).  Nichols also hadn't received information about all real estate

transfers within the six months prior to the petition date.  (ECF No. 27 at 9).  The first § 341 creditor's meeting was continued.[1]  (ECF No. 27 at 9).

A second § 341 creditor's meeting was held on November 17, 2009.  (ECF No. 27 at 8). Nichols had not received the required documents at that time.  (ECF No. 27 at 8).

A third § 341 meeting, on December 14, 2009, was continued for the same reason.  (ECF No. 27 at 9).  Also on December 14, 2009, the United States Trustee filed a motion to delay entry of discharge and to enlarge the time to file a motion objecting to discharge.   (Case No. 09-70605, ECF No. 17).  This motion was granted on January 7, 2010.  (Case No. 09-70605, ECF No. 19).

On February 5, 2010, the Peñas filed amended Schedules and an amended Statement of Financial Affairs ("SOFA").  (Case No. 09-70605, ECF Nos. 22, 23).  The Peñas' amended SOFA corrected several errors.  For instance, the original SOFA listed no payments to creditors in the 90 days preceding the petition date.  (Case No. 09-70605, ECF No. 1 at 59).  The amended SOFA listed the Peñas' ongoing mortgage payments to First National Bank, as well as a $15,000.00 loan repayment to Antonio Peña (Jesus Peña's brother) two days before filing.  (Case No. 09-70605, ECF No. 23 at 1).

The amended schedules did not correct all errors.  For instance, although Jesus Peña testified that during the relevant periods he had ongoing car payments, this information was never listed on the Peñas' Schedules.  (ECF No. 27 at 91; Pl. Ex. 1 at 16).  Meanwhile, Nichols still had not received all information she requested.

---

[1] Translators were provided for these hearings by the Language Assistance Office of the United States Trustee. (ECF No. 27 at 9).

**Missing Information**

The Peñas never produced all of the documents to which Nichols was entitled.   Most egregiously, the Peñas failed to produce many bank statements.[2]

The Peñas listed a Lone Star National Bank account on their amended Schedule B.  (Pl. Ex. 3 at 1).  The Peñas provided no bank statements related to their Lone Star National Bank account.  (ECF No. 27 at 11).

The Peñas' daughter also had a Lone Star National Bank account and did provide some bank statements at the Trustee's request.  (ECF No. 27 at 28).   The Trustee requested bank statements for six months prior to bankruptcy—that is, February 2009 to August 2009.  (ECF No. 27 at 28).  The Peñas' daughter only provided statements for July 2009 to November 2009. (ECF No. 27 at 28).

The Peñas also had accounts at Falcon International Bank,[3] First National Bank, and Inter National Bank.  (Pl. Ex. 3 at 1).  The Peñas' SOFA states that the accounts at First National Bank and Falcon International Bank were closed in the year preceding bankruptcy.  (Pl. Ex. 4 at 4). Nichols requested statements back to January 2009 for these accounts.

The Peñas only provided statements from March 2009 to May 2009 with respect to the account at Falcon International Bank.  (Pl. Ex. 16).

The Peñas only provided statements from July 2009 to November 2009 with respect to the account at First National Bank.  (Pl. Ex. 15).

---

[2] Additionally, as discussed in further detail below, the Peñas failed to turn over their 2007 and 2008 Tax Returns. Nichols had to contact the IRS on her own accord.  The day of trial the Peñas came with copies of the requested tax returns.  This type of belated compliance is insufficient.

[3] The Peñas list "Falcon National Bank" in their schedules.  (Pl. Ex. 3 at 1).  However, from the bank statements provided, it appears the proper name is "Falcon International Bank."  (Pl. Ex. 16 at 3).

The Peñas did, however, provide all requested information with respect to the account at Inter National Bank.  (Pl. Ex. 17).

**Transactions Requiring Examination**

From the information and documentation Nichols was able to obtain, she identified four categories of transactions that needed to be examined further:  (i) tax refunds from 2007 and 2008; (ii) a real estate transaction involving Jessica Rodriguez; (iii) a $15,000.00 purported loan payment by Jesus Peña to his brother two days prior to filing for bankruptcy; and, (iv) a real estate transaction involving Ramiro Pena Austin and Veronica Alejandra Peña.

When asked by Nichols what happened to assets related to these transactions, the Peñas stated that everything would be traceable through their bank records.  (ECF No. 27 at 22). Indeed, the Peñas included a similar statement in their answer to the complaint.  (ECF No. 10 at 3).  This makes their failure to turn over complete bank records more egregious and further evidence of fraudulent intent.

**2007 and 2008 Tax Refunds**

The Peñas originally told Nichols they could not recall what happened with these tax refunds—or whether they had even received them.  (ECF No. 27 at 14).  Despite being asked repeatedly, the Peñas did not produce copies of their IRS returns before the day of trial.  (ECF No. 27 at 18).

Nichols independently contacted the IRS.  Nichols learned that the Peñas' 2007 refund was applied by the IRS to unpaid 2006 taxes.  (ECF No. 27 at 15-16).  Part of the Peñas' 2008 refund was used to pay the remaining 2006 back taxes.  (ECF No. 27 at 15-16).  An $8,000.00 credit claimed by the Peñas in 2008 was withheld by the IRS pending further examination.  (ECF

No. 27 at 15).  The Peñas did receive a refund in 2008 for $2,518.72.  (ECF No. 27 at 16; Def. Ex. 23 at 2).

Despite not producing the returns before trial, the Peñas showed up at trial with copies of their tax returns.  (Def. Ex. 22 & 23).  These documents confirmed what the IRS told Nichols. (ECF No. 27 at 16; Def. Ex. 22 & 23).

The Peñas deposited the $2,518.72 into their Inter National Bank account on July 14, 2009.  (Pl. Ex. 17 at 9).  The Peñas failed to produce any documents showing the disposition of these funds.

**Real Estate Transaction with Jessica Rodriguez**

In their original schedules, the Peñas listed the sale of 3605 Gloria Avenue, McAllen, Texas ("Gloria Avenue property"), to Jessica Rodriguez for $20,000.00 on April 23, 2009. (Case No. 09-70605, ECF No. 1 at 31).

Documentation later produced reflected a sales price of $25,000.00, with $5,000.00 paid in cash and the remainder financed.  (Pl. Ex. 7, 8).  The Peñas also produced four receipts of $5,000.00 each, including one receipt from the date of the sale.  (Pl. Ex. 9).

Rodriguez testified honestly and competently at trial regarding this transaction.  For the most part, Rodriguez's testimony bolstered the Peñas' testimony.

Rodriguez acknowledged purchasing the Gloria Avenue property for $25,000.00.  (ECF No. 27 at 34).  The first $5,000.00 payment made on the date of the sale (April 23, 2009) was not a cash payment. (ECF No. 27 at 34).  Instead, Rodriguez was credited for a $5,000.00 loan she previously made to Jesus Peña.  (ECF No. 27 at 34).  Three other times (May 19, June 21, and August 14 of 2009) Rodriguez paid $5,000.00 cash to Jesus Peña.  (ECF No. 27 at 35).  For the final payment, Rodriguez paid about $3,000.00 of back taxes owed on the Gloria Avenue

property for years 2006 to 2007 and then paid Peña the remaining $2,000.00 in cash.  (ECF No. 27 at 35).[4]

All totaled, Rodriguez paid Jesus Peña approximately $17,000.00 cash in the four months prior to bankruptcy.

**Loan Repayment to Antonio Pena**

Antonio and Jesus Peña are brothers.  (ECF No. 27 at 44).  Antonio testified he thrice loaned Jesus $5,000.00 to aid Jesus's struggling construction business.  (ECF No. 27 at 44-45).  Jesus Peña turned over three cash receipts reflecting these transactions.  (Pl. Ex. 12).[5]

Jesus Peña also turned over a document, signed by Antonio Peña, indicating that Jesus fully repaid the $15,000.00 loan in cash on August 20, 2009—two days prior to filing bankruptcy.  (Pl. Ex. 13).  This loan repayment was not included in the original SOFA, (Case No. 09-70605, ECF No. 1 at 29), but was included in the amended SOFA, (Case No. 09-70605, ECF No. 23 at 1).  Antonio Peña testified that his brother did repay him in cash on that date.  (ECF No. 27 at 44-45).

Accepting Jesus and Antonio Peña's testimony, this explains $15,000.00 of the missing assets.

**Real Estate Transaction involving Ramiro Peña Austin and Veronica Alejandra Peña**

The Peñas sold an apartment building in McAllen, Texas to Ramiro Peña Austin and Veronica Alejandra Peña (the "Austin purchasers") on May 19, 2009.  (Case No. 09-70605, ECF

---

[4] Jesus Pena stated that he only required Jessica Rodriguez pay the back taxes and forgave the remaining $2,000.00 owed.  This statement is not credible in light of Jessica Rodriguez's testimony.

[5] The dates reflected on the cash receipts are: (i) January 21, 2009; (ii) March 10, 2009; and (iii) April 30, 2009.  (Pl. Ex. 12).

No. 1 at 31).  Although they have the same surname, the Austin purchasers are not related to the Debtors.

The Peñas still owed the original lender at the time of the sale.  (Pl. Ex. 20 at 1).  Jesus Peña had borrowed $70,000.00 from Lone Star National Bank in April 2003, secured by an original lien against the apartment building.  (Pl. Ex. 20 at 1).  On April 6, 2009, just over a month before selling the apartment building to the Austin purchasers, Jesus Peña renewed the loan in the amount of $55,721.30.  (Pl. Ex. 20 at 1).  The renewal notice states that unpaid principal comprised this entire amount—that is, Peña was current on payments for the apartment building as of April 6, 2009.[6]

The accompanying Settlement Statement[7] indicated the sales price was $140,000.00.  (Pl. Ex. 10 at 2).  The Settlement Statement indicated that, after subtracting a few minor charges from the $140,000.00,[8] the Austin purchasers executed a $110,000.00 promissory note in favor of Jesus Peña and paid $23,168.74 in cash.  (Pl. Ex. 10 at 2).

The promissory note in favor of Jesus Peña was secured by a lien on the property, evidenced by a Deed of Trust executed on May 20, 2009.  (Pl. Ex. 11 at 1).  The Deed of Trust specifically noted that it evidenced a "wrap-around" lien.  (Pl. Ex. 11 at 11) ("The lien will be inferior and subordinate to the lien [securing Lone Star National Bank's loan to Jesus Peña].").

---

[6] This is important because Jesus Peña testified that much of the unaccounted-for assets were used to pay past-due mortgage payments (in cash).  The fact that this mortgage was current as of April 6, 2009 undermines this argument.

[7] There are actually two Settlement Statements with slightly varying figures.  (Pl. Ex. 10 at 1, 2).  The Settlement Statements reflect that the Peñas either received $25,585.89 or $23,166.74 in cash at closing in addition to the promissory note secured by the Deed of Trust.  (Pl. Ex. 10 at 1, 2).  The Court assumes for the purposes of this Memorandum Opinion that the Peñas received the smaller figure in cash at closing.

[8] The Settlement Statement indicated the incidental charges paid by the Peñas were: (i) $3,545.63 of settlement charges; (ii) a "May payment" of $868.48; (iii) Prorated Tax of $763.00 from 1/1/2009 to 5/20/2009; (iv) Rent Proration of $658.15; and (v) Deposit of $1,000.00.  (Pl. Ex. 10 at 2).  This amounts to $6,835.26 in incidental charges to the Peñas.

Neither the Peñas' original nor amended schedules listed a $110,000.00 promissory note or a significant amount of cash on hand.  (Pl Ex. 1, 3).  When asked where the proceeds of this real estate transaction went, the Peñas stated that the bank statements would reflect everything. (ECF No. 27 at 22).  The Peñas failed to produce bank records that accurately account for these assets.

Jesus and Maria Peñas' testimony at trial regarding this transaction was confused and inconsistent.  At times their testimony conflicted with statements made prior to trial.  At times their testimony contradicted one another.  Other times they contradicted themselves.  This was not due to any language barrier.  It was because this significant loss of assets cannot be explained in a manner that is simultaneously innocent and plausible.

As explained in further detail below, enough assets are unaccounted for to deny the Peñas a discharge even under the most favorable interpretation of this transaction.  That interpretation is as follows.[9]

Jesus and Maria Pena received a check for just over $23,000 at closing.  (ECF No. 27 at 55, 113).  Instead of depositing it into a bank account, the Peñas immediately cashed the check. (ECF No. 27 at 75).  Contrary to their prior statements and the recorded real estate documents, the Peñas did not receive a promissory note for $110,000.00 at closing.  Instead, the Peñas received the $110,000.00 in various other ways at some point after closing.

The Austin purchasers agreed to take over Jesus Peña's loan payments to Lone Star National Bank, a debt secured by the apartment building they purchased. (ECF 27 at 80). This accounts for $55,000.00, the approximate principal of the Peñas' loan outstanding at the time.

---

[9] Pinpoint citations to testimony from both Jesus and Maria Peña will be provided where possible.  A review of the transcript will show testimony from both debtors occasionally conflicts with this interpretation of the events. However, the transcript will also reflect statements from both debtors that corroborates this interpretation of the events.

The Austin purchasers also paid approximately $30,000.00 to Hope Lumber, a creditor of Jesus Peña.   (ECF 27 at 81).[10]   The Austin purchasers paid $19,000.00 or $20,000.00 to Lacks Furniture, another creditor of Jesus Peña.  (ECF No. 27 at 81).  The Peña received the remaining amount in a check, which they immediately cashed.  (ECF No. 27 at 82).

The above amounts total approximately $105,000.00, meaning the Peñas would have received a check for only $5,000.00 at the end.   However, both Jesus and Maria Peña stated numerous times during their testimony that they received $12,000.00 after completion of these various transactions.  (ECF No. 27 at 79, 82, 90, 113, 114).  At a very minimum, therefore, the Peñas received $12,000.00 of the $110,000.00 at some point soon after closing.

Adding the $12,000.00 received at some point after closing to the approximately $23,000.00 received at closing, the Penas received over $35,000.00 in cash from this real estate transaction alone.[11]  No documents indicate how this money was later spent.

**<u>Analysis</u>**

Trustees may object to the granting of a discharge for any of the reasons listed in § 727(a).   11 U.S.C § 727(c)(1).   Nichols objects to discharge under 11 U.S.C. § 727(a)(2), (a)(4), (a)(5).  (ECF No. 1).

### 11 U.S.C. § 727(a)(5)  ["Unexplained Loss of Assets"]

This subsection states that a discharge shall not be granted where "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).

---

[10] The Peñas did state in their amended SOFA that creditor Hope Lumber was paid $30,000.00 at closing. (Pl. Ex. 4 at 2).

[11] This is, of course, under the most favorable interpretation for the Peñas.  There is no supporting documentation for payments to Hope Lumber or Lacks Furniture.

As described above, even under the most favorable interpretation of events, the Peñas need to explain the loss of approximately $39,500.00 in assets.   In the few months prior to bankruptcy, the Peñas received $17,000.00 in cash from Jessica Rodriguez, an IRS refund check for approximately $2,500.00, and at least $35,000.00 in cash from the sale of the apartment building.   Subtracting the $15,000.00 loan repayment to Antonio Peña results in $39,500.00 of lost assets.

Prior to trial the Penas stated that the bank records would reflect what happened with the proceeds of these various transactions.   (ECF No. 27 at 22).   The supporting documentation never materialized.

At trial, Jesus Peña offered a different explanation that conflicted with his prior statements.   Jesus Peña testified that the money never reached the bank accounts.   Instead, every time they received cash or check, the money was used to pay: (i) property taxes owed on the apartment building, (ECF No. 27 at 89); (ii) back payments due and owing on the loan secured by the apartment building, (ECF No. 27 at 89); (iii) the Peñas home mortgage payments on which they were behind, (ECF No. 27 at 91); and, (iv) payments owed to Ford Motor Company for motor vehicles, (ECF No. 27 at 91).

No documents support Jesus Peña's statements.   Furthermore, the limited evidence at trial indicates that this is not a plausible explanation for the loss of such a large amount of cash.

The allegation that the funds were used to pay property taxes on the apartment building is undercut by the Settlement Statement from the sale of the apartment building.   The 2009 property taxes are prorated between buyer and seller, with the seller's obligation paid at closing. (Pl. Ex. 10 at 1, 2).   Jesus Peña testified that back taxes represented the majority of the property tax payments. (ECF No. 27 at 93).   This explanation might have been plausible, except for the

manner in which he claimed to pay the back taxes.  Jesus Peña testified that he paid the back property taxes prior to closing on the apartment building, but that he paid with part of the $23,000.00 in cash he received *at* closing.  (ECF No. 27 at 93).  This is not plausible.

The allegation that the funds were used to make past due payments on the apartment building is undercut by documents the Peñas turned over to Nichols. Jesus Peña renewed the loan secured by a lien on the apartment building in April 2009, only a month before the sale to the Austin Purchasers.  (Pl. Ex. 20 at 1).  The loan was current as of the renewal date.  (Pl. Ex. 20 at 1).  As the sale was just over a month later, any amount due and owing on the loan was minimal and would represent only a tiny portion of the overall lost assets.

Jesus Peña testified he paid about $5,000.00 in back mortgage payments on his home in order to avoid foreclosure.  (ECF No. 27 at 91).  This is a plausible explanation in the abstract, yet the Peñas again fail to provide supporting documentation.  Furthermore, this accounts at most for a small portion of the lost assets.

Jesus Peña testified that he used a portion of the funds to pay past due payments on his car, but failed to identify any payments to secured creditors on his Statement of Financial Affairs.  (Pl. Ex. 1 at 16).[12]  Nevertheless, at trial Peña stated that he paid $7,000.00 to Ford Motor Company for past-due vehicle payments.  (ECF No. 27 at 91).  Again, even if true, this accounts for only a small portion of the lost assets.

There is essentially no credible evidence to support the Peñas' theory about this loss of assets.  The documentary evidence disproves much of the Peñas' testimony.  The portions of the Peñas' testimony not undercut by the documents would explain a small portion (maybe

---

[12] Unlike other schedules, it does not appear the Penas amended their Schedule D.  (Pl. Ex. 3).

$12,000.00 to $15,000.00) of the lost $39,500.00.[13]  Indeed, the Pena's credibility was destroyed by the conflicting documentary evidence.  The Court credits none of their oral testimony.

By no small margin, the Peñas have failed to satisfactorily explain the loss of a significant amount of assets.  Nichols's § 727(a)(5) objection to their discharge is granted.

**11 U.S.C. § 727(a)(4)**

This subsection states that a discharge shall not be given to a debtor who "knowingly and fraudulently, in or in connection with the case—made a false oath or account; . . . or withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."  11 U.S.C. § 727(a)(4).

The Peñas' knowingly and fraudulently made false oaths or accounts in this bankruptcy proceeding. The Penas knowingly and fraudulently refused to turn over to Nichols substantial amounts of documents relating to their property and financial affairs.  Either is sufficient for a successful objection to discharge.  *See* 11 U.S.C. § 727(a)(4)(A), (D).

The Peñas failed to turn over to Nichols a substantial amount of documents.  (*See supra* pp. 2-3).   Nichols repeatedly requested the documents from the Peñas.  (*See supra* pp. 2-3). Their failure to turn over the documents was a knowing failure.

The Peñas knowingly made false oaths or accounts, with their trial testimony being the most obvious example.

---

[13] Once again, the $39,500.00 figure for lost assets is under the most favorable interpretation of the facts possible. Including transactions for which the Peñas provided no documentation besides their own oral statements (that is, the Hope Lumber and Jacks Furniture payments), adds an additional $50,000.00 to the lost asset total.  Including Jesus Pena's suspicious loan repayment to his brother would add $15,000.00 more to the total.  The real amount of unexplained lost assets exceeds $100,000.00.

Actual fraudulent intent must be shown but "may be inferred from the actions of the debtor and may be proven by circumstantial evidence." *In re Chastant*, 873 F.2d 89, 91 (5th Cir. 1989). The circumstantial evidence of fraudulent intent is overwhelming

The Peñas first argued the loss of assets would be explained by a review of their bank records. (ECF No. 27 at 22). They then failed to produce complete bank records.[14] Additionally, the Peñas did not produce their tax returns until the day of trial. At trial, the Peñas repeatedly made statements which, when not inherently contradictory, conflicted with the only credible evidence before the Court as well as their own prior statements. All of this occurred in the context of a bankruptcy where: (i) severely deficient schedules were initially filed; (ii) amended schedules weren't filed until six months after the petition date; (iii) the § 341 meeting was continued on several occasions because of the debtors' failure to produce documents; and (iv) the debtors cannot explain a significant loss of assets that predominantly relate to transactions belatedly revealed in the amended schedules.

The Peñas knowingly and fraudulently made false oaths or accounts and refused to turn over to Nichols substantial amounts of documents relating to their property and financial affairs. The Peñas discharge must be denied under § 727(a)(4).

### 11 U.S.C. § 727(a)(2)

This subsection states that courts shall not grant discharge to a debtor who:

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred,

---

[14] This failure is even more surprising and suspicious in that for most bank accounts the Peñas produced partial records. Even if the Peñas closed some of these accounts, as they allege, this would not explain the partial disclosure. For instance, the Peñas produced statements related to the Falcon International Bank account from March to 2009 to May 2009. (Pl. Ex. 16). Even if they closed this account after May 2009, nothing prevented them from obtaining their January 2009 and February 2009 statements.

> removed, destroyed, mutilated, or concealed—property of the debtor, within one year before the date of the filing of the petition . . . .

11 U.S.C. § 727(a)(2).

Nichols has not met her burden on this objection.  Nichols does not appear to be arguing that either real estate transaction, or the loan repayment, were transfers done with the intent to hinder or defraud creditors.  If she is, there is little evidence of this—at least as to the two real estate transactions.  There is no evidence the properties were sold well below market value or that the sales themselves were not genuine.  The proceeds are simply not accounted for.

Nichols, quite understandably, is trying to figure out what happened to the proceeds from these transactions and others.  The proper subsection for this type of objection is § 727(a)(5), not § 727(a)(2).

### Conclusion

The Court will issue a separate judgment in accordance with this Memorandum Opinion. A copy of this Memorandum Opinion will be forwarded to the United States Attorney and to the Federal Bureau of Investigation in compliance with the Court's reporting obligations.

SIGNED **June 8, 2012.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE